UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No.  2:05-cv-05177-HH |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TWINING SERVICES CORPORATION, | ) | |
| d/b/a TWINING VILLAGE, | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF UNITED STATES' MOTION
FOR DISBURSEMENTS TO CLAIMANTS FROM AGGRIEVED PERSONS' FUND**

**I.  INTRODUCTION**

The Court entered a consent order in this case on October 3, 2005, resolving the United

States' lawsuit alleging that defendant Twining Services Corporation ("TSC") engaged in a

pattern or practice of discrimination against persons with disabilities in violation of the Fair

Housing Act ("FHA"),  42 U.S.C. §§ 3601-3619.  The United States' complaint alleged that TSC

employed or employs several policies, both written and unwritten, that discriminate against

persons with disabilities, including: 1) banning the use of manual wheelchairs, motorized

wheelchairs, and motorized scooters in the dining rooms of two of the three residential facilities,

Twining Manor and Twining Village; 2) additionally restricting the public and common use

areas in which motorized wheelchairs and scooters may be used in Twining Manor and Twining

Village; and 3) requiring persons who use motorized scooters to indemnify TSC and to submit to

an evaluation and training program annually, regardless of their "driving record."

The consent order, among other things, established a $67,500 settlement fund to

compensate individuals who were injured or inconvenienced by these alleged FHA violations and prescribed a process for the parties to attempt agreement on appropriate damages awards for such persons.   This Court is to make the final determinations of aggrieved persons and the appropriate amount of damages that should be paid to each after the United States presents its recommendations to the Court together with the claimants' declarations and TSC's rebuttal. [1]

That process has been exhausted. The United States has identified six persons with disabilities who were aggrieved by TSC's policies restricting the use of mobility aids.   On April 17, 2006, we submitted to TSC the declarations of these individuals and our preliminary determinations of damages for each.  *See* Exhibit 2 (Declaration of Michael Stickley, ¶ 4) and Exhibit 3.  TSC responded with a letter dated May 25, 2006, arguing that the claims should be denied or "reduced significantly," without making any monetary offer.  Exhibit 2 (Declaration of Michael Stickley, ¶ 5) and Exhibit 4.  By letter dated July 11, 2006, TSC offered to pay $11,900 to four persons and nothing to two.  Exhibit 2 (Declaration of Michael Stickley, ¶ 6) and Exhibit 5.  We have been unable to negotiate an amount agreeable to the parties and the claimants.

We therefore respectfully request that the Court issue an order for disbursements to these six individuals in the amounts recommended by the United States for the reasons set forth below.

## II.  FACTS AND RECOMMENDATIONS[2]

**1.   Mildred Toth          $18,000**

Mrs. Toth lived at Twining Village for three years, from May 2001 until May 2004.  She daily suffered physical pain and exhaustion, inconvenience, frustration, and annoyance because

---

[1]  Section V (¶¶ 16-25) of the order pertains to payments to aggrieved persons.   *See* Exhibit 1.

[2]  The facts derive from the claimants' declarations at Exhibit 3.

of Twining's policies.  Those policies also cost her roughly $100 in out-of-pocket expenses.

Toth has chronic obstructive pulmonary disease and emphysema, debilitating conditions that obstruct the air flow in her lungs.  She uses oxygen 24 hours a day, seven days a week, and carries a portable oxygen tank at all times that hangs on a strap and weighs about five pounds. She has difficulty walking 50 feet on a good day.  Oxygen deprivation makes any amount of exertion extremely difficult.

While at Twining, Toth lived in the independent living area, the Village, and used a walker and motorized scooter to aid her in getting from one place to another.  She paid Twining for one meal per day, seven days a week, as part of her rent.  The meal was served in the dining room of the Community Center.  She used her scooter to get to the Center from her apartment, but then was required to park the scooter outside the dining room and walk to her table.  Tables were assigned daily, so hers could be about 30 feet from the door where the scooters were parked or across the entire dining room.  Twining made no effort to assign people with disabilities to tables near the room's entrance.

Toth had to carry her oxygen tank while making that walk back and forth and, for most of the time, was not even allowed to use her walker to assist her.  Shortly before she left, Twining changed its policy to allow walkers in the dining room, but the walkers were taken away by wait staff once the person arrived at the table and returned after the meal.  It was very difficult for Toth to transition from the scooter to standing and walking because her oxygen level would drop severely so that she fought for breath when maneuvering through the room.  The effort left her extremely tired.  Towards the end of her stay at Twining, Toth was too tired to make the walk and would eat in her room two times a week, on average.  Room service cost an extra $5 or $6

on top of the cost of the meal.

While she was a tenant, Twining only allowed the use of scooters to and from the vehicle parking lots or in the hallways of the independent living area.  Then it imposed a policy that all scooters had to be parked inside the residents' apartments rather than in the hallway in front of their apartment entrances.  This was nerve wracking for Toth because the scooter blocked her exit from the apartment in case of emergency.  Twining also decided that, when residents were visiting other people's apartments, scooters could not remain outside the host's apartment door. The scooter had to either be brought into the host's apartment or be parked in a designated "scooter parking area".  These parking areas were often quite a distance away so that, even with the aid of her walker which she had to bring along, it was still a struggle for Toth to visit her friends.

Toth also had to go through Twining's annual driving test to show that she knew how to use the scooter safely and have the scooter inspected to enure it was mechanically sound.  The fee was $35.   She had only purchased the scooter a couple of months before this check up and so was very annoyed at what she felt was an unnecessary expense.

**2. Kathryn M. Carr          $14,500**

Mrs. Carr has lived at Twining Village since 1995.   Before she arrived, surgery on a tumor near her ear left her with balance problems.  In 2001, she fell and irreparably severed nerves in her right arm.  It is useless and trembles, as if she has Parkinson's disease.  She suffered fatigue and anxiety for roughly five years, from 2001 until recently, due to Twining's policy against scooters and wheelchairs in its dining rooms, and some out-of-pocket loss for having to abandon her scooter when she moved from the Village to the Manor in August 2003.

Carr is now 93.  After she fell at age 88, she could not walk without a mobility aid.  She used a walker to go short distances and also purchased a motorized scooter for $2,888, as best she recalls.  She ate lunch in the Village dining room on most days.  Twining did not allow the scooter inside the dining room, so she had to park it outside and use her walker to get to a table.  That was difficult for her.  She had to take extreme care transferring between the scooter and the walker because she was unsteady due to her balance problem.  In addition, because her right arm is basically useless, her left one alone must move the walker and support her weight.  That arm gets especially tired from the effort of walking, and so does she.  She also worries about falling because she is unsteady using the walker.  For these reasons, she would rather have been able to go to a dining table with the scooter, and avoid having to get off it and back on it.

Twining officials transferred her to the assisted living facility, the Manor, in August 2003, at age 90, where motorized scooters were not allowed.  She gave hers to relatives who in turn donated it to a low-income individual in response to an advertisement.  Carr states that, at the beginning, she could not even use a manual wheelchair in the Manor.  She owned one, but the Twining Manor aides would not push the chair.  They told her to walk.  So she had to walk with her walker back and forth between her apartment and to her assigned table in the Manor dining room twice a day, usually, for lunch and dinner.  Otherwise, she got where she wanted to go but it took her a long time and it was very frustrating.  She mostly stays in her apartment at the Manor as a matter of preference.

Due to the intervention of Carr's doctor, aides began to push Carr to the dining room.  She believes that started within the last two years.  She still had to transfer from the wheelchair to a walker and walk into the dining room, however.  That policy changed "recently," according

to Carr, and she is now pushed in a wheelchair straight to my dining room table.

**3.  James Mullen            $12,000**

James J. Mullen has resided at Twining Village since December 2000.  He did not use a walker or wheelchair until he fell in August 2005, despite a leg amputation that requires the use of a prosthesis.

He suffered roughly $6,000 in out-of-pocket losses, depression and loneliness, and diminished quality of life, however, due to stays in Twining Hall, TSC's health care facility during 2002.  These were extended by roughly one to two months due solely to his inability to walk from his apartment in Twining Manor, the assisted-living facility, into the facility's dining room.  He also suffered a loss of independence by being denied the use of a motorized scooter for roughly eight months, from the spring of 2005 until October 2005, when TSC lifted its ban on these devices at Twining Manor due to our consent order.

Mullen was 82 in May.  He was Assistant Regional Commissioner for Region III of the Social Security Administration in Philadelphia when he retired and continued to live in his family home and then in Florida before entering Twining Village.  He lived in Twining Village, TSC's independent living area, from December 2000 to October 2002 and was ambulatory.  He was hospitalized in February, April, and May 2002, and each time convalesced in Twining Hall. On June 4, 2002, his leg was amputated above the knee and he re-entered the Hall on June 13. After 100 days of care had accumulated, on July 29, 2002, Medicare no longer covered this expense.  Mullen's daughter and sons discontinued the lease on his Twining Village apartment and sold his car to help defray the cost of his stay at the Hall.

His daughter and sons then met with the administrator of Twining Manor, questioning the

need for Mullen's extended stays in Twining Hall.  That individual informed them that Mullen could not move to the Manor until he could walk from the entrance to the dining room to his table – a distance of some 50 feet.  Mullen could not do that, even with a walker.  He was not able to enter the Manor until October 2002.  He was charged $167.00 per day at the Hall.  After deducting the rent he would have paid on his Village apartment, this amounted to a $5,624 out-of-pocket expense that Medicare did not cover, because he could not walk into the Manor dining room.

Mullen suffered depression and loneliness at the Hall, which was like a hospital with no privacy or space for guests.  Most of the residents there had Alzheimer's and could not socialize normally.  Sometimes they would steal items during the night.  When he wheeled into the dining room, most of the residents were being fed by staff.  It was already hard for him to deal with the loss of his leg.  The atmosphere in the Hall made that adjustment even more difficult.

Since Mullen entered Twining Manor in October 2002, there were times that month and during November 2002 when he could not walk into the dining room because his prosthesis was out for repair or had caused a blister to form on his stump.  Twining charged him $16.50 to bring meals to his room, in addition to the cost of the meal.  He estimates that the extra cost for these meals totaled about $400.00.

Finally, Mullen approached Twining Manor officials in the spring of 2005 about obtaining a motorized scooter so that he could get around on his own and feel more independent. He had friends in the Village that he could only visit if an aide were available to push his manual wheelchair over there.  The Twining Manor administrators denied his request, stating that motorized scooters were not allowed in Twining Manor.

**4. Betty McGonigal          $10,000**

McGonigal moved to Twining Manor in August 2003.  She suffered physical pain and exhaustion for ten months, from May 2004 to February 2005, due to Twining's ban on manual wheelchairs in the dining rooms and loss of independence and self-esteem and diminished quality of life for 17 months, from May 2004 to October 2005, due to Twining's ban on motorized scooters in the Manor.

McGonigal is 74.  She retired at age 70 after working 20 years in the accounting field.  In her final job, she managed the accounts payable department for a local business.  She entered Twining Village because multiple sclerosis caused her to lose the use of her right arm and limits the use of her right leg.  When she first arrived at Twining, she used a four-wheeled walker as a mobility aid.  In May 2004, however, she broke her hip and has had to use a manual wheelchair since that time.

From that time until February 2005, three times a day, McGonigal had to wait for an aide to wheel her to the dining room and then walk 15-20 feet to her assigned table.  When she was done, she waited for an aide to return her walker and she made the trip back.  Because she has no muscle control in her right leg, she had to lean on the walker, take a step with her left leg, and then drag the right leg to join it.  The process was extremely slow and exhausting.  These trips took all the little energy she has on account of her disease.  When she returned to her room, she had to raise her legs and rest.

After her fall, in May 2004, McGonigal wanted to obtain a motorized wheelchair or scooter so that she could be independent and go where she wanted throughout the community, without having to wait on an aide to push her wheelchair to bingo, for example, or to get her hair

done.  She was told that motorized devices were not allowed in the Manor.  She is now

investigating the purchase of a motorized wheelchair.  As she puts it, "I miss very much being

able to go where I want when I want."

**5.  Estate of Alyce Endriss  $8,000**

Carol Borkowski is the daughter and personal representative of the estate of Alyce R.

Endriss, who died in July 2005.  She has submitted a claim on behalf of her mother's estate, as

permitted under Pennsylvania statute.[3]  Endriss suffered pain, loss of independence and self-

esteem, and diminished quality of life for nearly a year due to Twining's ban on manual

wheelchairs in the dining rooms and motorized scooters in the Manor.

Endriss lived at Twining Village for 12 years, from 1993 to March 2005.  She lived in the

independent living area, the Village, until June 2004 when she entered the Manor.  By then she

had osteoarthritis so severely that her legs bowed and it was extremely difficult for her to walk.

She used a walker as a mobility aide for short distances, and otherwise needed a manual

wheelchair.

Endriss had seen scooters in the Village but it was not until she entered the Manor that

she learned they were not permitted there.  She also understood that she could not own a manual

wheelchair in the Manor.  She told her daughter they were not permitted to be kept in the

apartments or in the hall outside residents' doors.  Borkowski states she never saw a resident

---

[3]  Because the Fair Housing Act is silent on the issue of whether a cause of action
survives death, we look to state law.  *Robertson v. Wegmann*, 436 U.S. 584 (1978).
Pennsylvania law provides that "[a]ll causes of action or proceedings, real or personal, shall
survive the death of the plaintiff . . . ." 42 Pa. C. S. A. § 8302.  *See Jones v. McElroy,* 429 F.
Supp. 848, 852 (E.D. Pa. 1977) (decedent's mother may sue in her representative capacity under
42 U.S.C. § 1983 to address alleged deprivations of decedent's civil rights).

using a manual wheelchair on his or her own; rather, wheelchairs were owned by Twining and aides pushed residents who used them.

From June 2004 to March 2005, Twining aides would take Endriss to and from the dining room daily.  She would be deposited at the dining room entrance until it opened and then she would have to maneuver with her walker to her assigned table at the back of the room.  Her walker would be returned when an aide was available to get it for her, and she would then wait for an aide to wheel her back to her room.  Borkowski witnessed her mother's journey, and states that it was very difficult for her, that she suffered fear of falling, and that it robbed her of her independence and self-esteem.  Borkowski also states that her mother gave up her efforts to go to social activities because the trips to the dining room took all the energy she had each day.

Borkowski did not challenge the Twining policies because Endriss expressed anxiety that if she could not get around on her own she would be charged extra fees and that if she "rocked the boat," she would be "kicked out."  Additionally, Endriss was a very proud and independent person who was mentally astute and capable of handling her own affairs until the year of her death.

Endriss was hospitalized in March 2005 and her family moved her to Pickering Manor Home in Newton, Pennsylvania.  There she was given a custom fit wheelchair and taught to use it by scooting her feet on the floor.  Borkowski states that her mother "was quite proud to show us how she could get around.  She had the freedom to move about the facility herself. . . .  For the first time in years, when we visited we were able to take her outside on the porch to enjoy the beautiful spring sunshine."

**6.  Edna Wolinsky           $ 5,000**

Edna F. Wolinsky has resided in Twining Manor since May 2, 2005.  She is 93 years old. Her daughter, Maxine Valunas, has power of attorney for all her affairs and has submitted a claim on her behalf.

Wolinsky suffered extreme pain and anxiety for about three months, until July 22, 2005, due to Twining's ban on manual wheelchairs in the dining room.  She was made to walk from the dining entrance to her table and back three times a day despite a state agency ruling in February 2005 that the ban was inappropriate[4] and after Twining had begun to relax that policy for some more long-term residents (*e.g.*, McGonigal, Mullen).  Valunas states that a Twining representative told her and her brother and sister when they toured the facility that being able to walk into the dining room was a prerequisite to living at Twining Manor.

Wolinsky has severe degenerative disc disease that causes constant pain in her back and down into her buttocks and thighs.  For some years, pain medication was injected into her back though a catheter but, eventually, the vertebra became so tightly packed that a catheter could not be inserted.  She also has severe osteoarthritis in her right knee and polymyalgia rheumatica, a disorder that causes stiffness and muscle pain in her shoulders and hips.  The knee is always swollen and cannot bear weight.  To help her cope with the pain of these conditions, she takes Percocet every four hours and wears a fentanyl patch that is changed every three hours.  As a

---

[4] In response to a resident's complaint, the Pennsylvania Department of Public Welfare, Division of Personal Care Facilities/Licensing issued a "Statement of Deficiencies" in February 2005, faulting Twining's policy banning manual wheelchairs in the dining rooms.  Twining submitted a "corrective action" to be completed February 21, 2005.  It promised to "make modifications" to its dining services program "to ensure safe access to the dining room for all residents, guests, and staff, including wheelchairs [*sic*]."  *See* Exhibit 2 (Declaration of Michael Stickley, ¶ 7) and Exhibit 6.

result of these impairments, she can only walk short distances with the aid of a walker (such as from her bed to the bathroom). Otherwise, she must use a wheelchair.

Wolinsky moved into Twining with her husband, Nathan, who died in February 2006. She was hospitalized July 22, 2005, and returned to Twining in early August 2005. From that time, she has been wheeled into and out of the dining room without having to walk.

From May 2 to July 22, 2005, however, Wolinsky had to wait on an aide to take her to an area approaching the entrance to the dining room, return her walker after her meal was finished, and wheel her back to her room. Her husband was only allowed to carry her walker. He was upset that he could not help his wife as he had always done and that, in turn, upset her.

Wolinsky chose not to be wheeled directly to the dining room entrance because there were no wheelchairs in sight there. She feared TSC would transfer her to Twining Hall, away from her husband, and that she equated with the "nursing home" she dreaded. She knew it would be more expensive and that she would have even less independence there. So she walked roughly 35 feet to her assigned table and back out again. The trips caused her extreme pain. She was essentially walking on one leg, because of her bad knee, and the effort of bearing down on the walker exacerbated the pain in her shoulders. She pays for three meals a day, but there were times that the pain was so debilitating that she chose to forego meals.

### III.  ARGUMENT

The Court should order TSC to pay the compensation recommended by the United States to make these six aggrieved persons whole for the pecuniary damages, physical pain, and emotional distress they suffered as a result of discriminatory policies restricting the use of mobility aids at Twining Village, in violation of their civil rights guaranteed by the Fair Housing

Act.  In the declarations we have submitted, those people described the expenses they incurred, the physical pain,  and the emotional toll of that discrimination.  The sum of money we seek for each of them fairly compensates for the nature, severity, and duration of the harm that each person endured. Those amounts are modest as compared to recoveries in other civil rights cases.

The declarations are sufficiently detailed to sustain the United States' recommendations. They present evidence of actual injury (*see Gunby v. Pa. Elec. Co.,* 840 F.2d 1108, 1121-22 (3d Cir. 1988)) through testimony that establishes a "reasonable probability" that the six individuals suffered physical pain and emotional distress because of TSC's discriminatory policies.  *Spence v. Board of Ed.*, 806 F.2d 1198, 1201 (3d Cir. 1986).   "Because of the difficulty of evaluating the emotional injuries which result from deprivations of civil rights, courts do not demand precise proof to support a reasonable award of damages for such injuries."  *Block v. R.H. Macy & Co., Inc.*, 712 F.2d 1241, 1245 (8th Cir. 1983) (citation omitted).

Additionally, housing providers must take their victims as they find them; that is, damages are measured based on the injuries actually suffered by the individual, not on the injuries that would have been suffered by a "reasonable person."[5]   In this case, the aggrieved persons are quite elderly and their daily lives are already onerous and stressful because walking is painful or impossible.  The illegal restrictions on the use of manual and motorized wheelchairs and scooters that they had to work against at Twining Village compounded the difficulties they

---

[5]  *See, e.g.*, *Stewart v. Crosson*, 1 Fair Hous.-Fair Lend. (P-H) ¶  15,596 (D. Tenn. June 3, 1988) (plaintiff was poor, powerless and suffered deeply); *HUD v. Kelly*, 2 Fair Hous.-Fair Lend. (P-H) ¶  25,034, 25,362 (HUD ALJ Aug. 26, 1992) (damage award gave consideration to fact that complainant was sensitized by past racial discrimination); *HUD v. Properties Unlimited*, 2 Fair Hous.-Fair Lend. (P-H) ¶  25,009, 25,152 (HUD ALJ Aug. 5, 1991) (damage award gave consideration to fact that complainant was eight and one-half months pregnant at time of discriminatory act).

face each day.

Finally, the sums recommended here by the United States to compensate for physical pain and hardship and emotional distress, ranging from $5,000 to $18,000, are well within the range of awards for similar injuries.  Indeed, they are modest in comparison to awards solely for emotional distress to other victims of discrimination .  *See, e.g., Broome v. Blondi,* 17 F. Supp. 2d 211, 223-26 (S.D.N.Y. 1997) ($114,000 per victim for emotional damages is not excessive in housing discrimination suit; even a single instance of discrimination can warrant significant emotional distress damages); *Balachowski v. Boidy*, 2000 WL 1365391 (N.D. Ill. Sept. 20, 2000) ($25,000 award by magistrate judge upheld for a plaintiff who suffered emotional distress due to the inaccessibility of her unit); *HUD v. Twinbrook Village Apts.*, 2001 WL 1632533 at * 27 (HUDALJ Nov. 9, 2001) ( judge awards $135,000 to three tenants who used wheelchairs based on refusal to permit them to replace the steps at their front doors with ramps); *HUD v. Ocean Sands, Inc.*, 1993 WL 471296 at * 4 (HUDALJ Nov. 15, 1993) and 1993 WL 343530 at * 25 (Sept. 3, 1993) (judge awards $22,500 for couple who were refused permission to add a wheelchair lift and wooden walkways to their housing); *HUD v. Burns Trust,* P-H: Fair Housing-Fair Lending Rptr. ¶ 25,073, at pp. 25,683-84 (HUD ALJ 1994), relief adjusted on remand, P-H: Fair Housing-Fair Lending Rptr. ¶ 25,092, at pp. 25,840-43 (HUD ALJ 1995) (judge awards $49,000 and $29,500 to man with AIDS and his partner who were discriminatorily evicted); *HUD v. Dedham Housing Authority*, P-H: Fair Housing - Fair Lending Rptr. ¶ 25,015, at pp. 25,215-16 (HUD ALJ 1991) (judge awards $10,000 for emotional distress to man denied accessible parking space); *CHRO ex rel. Westphal v. Brookstone Court, LLC*, 2006 WL 463262 at *5 (Conn. Super. 2006) (judge awards $10,000 to woman who used wheelchair and who was

refused apartment because she needed a ramp).[6]  As the HUD administrative law judge in

*Twinbrooks Village Apts.* put it, "[i]n the face of continuing housing discrimination, the genuine

emotional suffering associated with such discrimination should not be devalued by unreasonably

low compensatory damage awards."  2001 WL 1632533 at * 27. [7]

---

[6]  Private settlements in unreported cases are also relevant.  The California Department of Fair Employment and Housing obtained a $1 million settlement for a tenant with a disability who sought an accessible parking space from her landlord for three years, http://www.dfeh.ca.gov/litigation/20051104.asp.  In *Wright v. Rocks* (D. Md.), the housing provider paid plaintiff, who was deaf and blind, $160,000 for rejecting his application because the apartment complex did not have "handicapped facilities" and suggesting alternative apartment buildings with such facilities.  Defendants also agreed to give plaintiff a rent-free, two-bedroom apartment for life.  *See* www.washlaw.org/projects/fair_housing/fh_lawsuit.  In *Hayes v. Summerwood Investments* (N.D. Cal.), the housing provider paid plaintiff $126,000 because it did not keep the building's elevators in repair.  Absent a working elevator, plaintiff, who used a wheelchair, could not come and go from her upper level apartment.  *See* www.fairhousing.com/index.cfm?method=page.display&pagename=advocate_november96_page5.

[7]  Damages awarded to workers with disabilities in employment cases are also instructive. For example, in *Marcano-Rivera v. Pueblo International, Inc.*, 232 F.3d 245 (1st Cir. 2000), the court upheld a $225,000 jury verdict against an employer that failed to reasonably accommodate a store clerk for four years who had paraplegia and used a wheelchair.  The employer refused the woman an accessible parking space and made her work the cash register during busy times in a physical space that was too small for her wheelchair.  She therefore had to go through a laborious and humiliating process of transferring to a stool in front of impatient customers.

*See also Smith v. Bell Atlantic*, 829 N. E. 2d 228 (Mass. App. Ct. 2005) (upholding jury's award of $207,000 for emotional distress suffered for six years by an employee with post-polio syndrome whose employer's refusal to accommodate her with a furnished home office left her feeling frustrated and inadequate, resulting in anxiety and diminished self-esteem); *Shesko v. City of Coatesville*, 324 F. Supp. 2d 643, 652 (E.D. Pa. 2004) ($20,000 verdict upheld for woman discriminatorily passed over for promotion, where she testified that she was sad and depressed and found it hard to continue to do her job); *Mondzelewski v. Pathmark Stores, Inc.*, 2000 WL 654137 *18 (D. Del. 2000) ($500,000 award upheld under Americans with Disabilities Act where employer discriminated and retaliated against worker who sought reasonable accommodation, causing him to suffer acute depression); *Griffiths v. Gigna Corporation*, 857 F. Supp 399, 408-09 (E. D. Pa. 1994) ($102,000 award upheld for humiliation and mental anguish of a man who was fired in retaliation for complaining of discrimination).

### III.  CONCLUSION

For the foregoing reasons, the United States requests the Court to order payments of compensatory damages to the six aggrieved persons in this case in the amounts recommended by the United States.

Respectfully submitted,


PATRICK L. MEEHAN                    WAN J. KIM
United States Attorney                 Assistant Attorney General

Virginia A. Gibson                   STEVEN H. ROSENBAUM
Chief, Civil Division                Chief

Annetta Foster Givhan                NICOLE PORTER
Assistant United States Attorney     Deputy Chief
615 Chestnut Street, Ste. 1250
Philadelphia, PA 19106
Phone : (215)-861-8319
Fax: (215) 861-8349                          s/Susan B. Reilly
                                     SUSAN BUCKINGHAM REILLY
                                     Trial Attorney
                                     U.S. Department of Justice
                                     Civil Rights Division
                                     Housing & Civil Enforcement Section
                                     950 Pennsylvania Avenue, N.W. - NWB
                                     Washington, D.C. 20530
                                     Phone: (202) 307-2230
                                     Fax: (202) 514-1116